UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RANCH 967 LLC | § | CASE NO. 15-10314-tmd |
| (Debtor) | § | (Chapter 11) |
| | § | |

## **DEBTOR'S DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION**

TAUBE SUMMERS HARRISON
TAYLOR MEINZER BROWN LLP
Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
Christopher G. Bradley
State Bar No. 24069407
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

ATTORNEYS FOR DEBTOR

Dated:  September 15, 2015

## TABLE OF CONTENTS

**ARTICLE I. INTRODUCTION** .................................................................................. 1
   1.1    Filing of the Debtor's Chapter 11 Case ............................................. 1
   1.2    Purpose of Disclosure Statement ...................................................... 1
   1.3    Plan Balloting and Confirmation Procedures ................................... 2

**ARTICLE II. DEBTOR'S BACKGROUND AND FINANCIAL PICTURE** ......................... 4
   2.1    General .............................................................................................. 4
   2.2    History of Debtor and Causes of Bankruptcy Filing ........................ 4

**ARTICLE III. SELECTED FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS** ...................................................................................... 6
   3.1    General .............................................................................................. 6
   3.2    Financial Projections of the Reorganized Debtor; Sources and Uses ......................... 6
   3.3    Valuation and Description of Debtor's Assets ................................. 7

**ARTICLE IV. PROCEEDINGS IN THE CHAPTER 11 CASE** ......................................... 7
   4.1    Commencement and Administration of the Case ............................. 7

**ARTICLE V. SUMMARY OF THE DEBTOR'S PLAN** ................................................... 8
   5.1    Explanation of Chapter 11 ................................................................ 8
   5.2    Terms of the Plan Control ................................................................ 8
   5.3    New Financing of the Debtor ........................................................... 8
   5.4    Claims .............................................................................................. 8
   5.5    Classification and Treatment ........................................................... 9
   5.6    Discharge of Claims. ...................................................................... 13
   5.7    Plan Releases and Exculpation. ..................................................... 13

**ARTICLE VI. IMPLEMENTATION OF PLAN** ............................................................ 14
   6.1    Summary of Implementation of the Plan ....................................... 14
   6.2    The Reorganized Debtor's Obligations Under the Plan ................. 14
   6.3    Exemption from Transfer Taxes ..................................................... 15
   6.4    Claims Objections. ......................................................................... 15
   6.5    Contingent Claims ......................................................................... 15
   6.6    Distributions on Allowance or Disallowance of Disputed ............. 15
   6.7    Undeliverable/Returned Distributions ........................................... 15
   6.8    De Minimis Distributions ............................................................... 16
   6.9    Additional Charges ........................................................................ 16
   6.10   Treatment of Executory Contracts and Unexpired Leases ............. 16
   6.11   Pending Claims and Causes of Action .......................................... 17

**ARTICLE VII. CONFIRMATION OF THE PLAN** ....................................................... 19
   7.1    Feasibility ...................................................................................... 19
   7.2    Best Interests Test .......................................................................... 19

**ARTICLE VIII. ALTERNATIVES TO THE PLAN** ..................................................... 19
   8.1    General ............................................................................................ 19

8.2     Alternative Plans........................................................................................ 20
8.3     Liquidation Under Chapter 7 or Dismissal................................................. 20

**ARTICLE IX. RISK FACTORS ............................................................................... 20**
9.1     Bankruptcy Risks....................................................................................... 20
9.2     Plan Risks .................................................................................................. 21
9.3     Business Risks ........................................................................................... 21

**ARTICLE X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................................................................................................................... 22**
10.1    Income Tax Consequences ........................................................................ 22

**ARTICLE XI. JURISDICTION OF THE COURT ................................................... 22**
11.1    General Retention of Jurisdiction.............................................................. 22
11.2    Specific Purposes...................................................................................... 22

**ARTICLE XII. MISCELLANEOUS ......................................................................... 24**
12.1    Amendment or Modification of the Plan................................................... 24
12.2    Effective Date and Final Decree................................................................ 25

**ARTICLE XIII. REQUEST FOR APPROVAL AND ACCEPTANCE OF PLAN ............. 25**

## <u>IMPORTANT NOTICE</u>

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION DETERMINED THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT INCLUDES FORWARD-LOOKING STATEMENTS BASED LARGELY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR OR THE REORGANIZED DEBTOR'S BUSINESS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS INDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NEITHER THE DEBTOR NOR THE REORGANIZED DEBTOR UNDERTAKE ANY OBLIGATIONS TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.**

**NO REPRESENTATIONS OR OTHER STATEMENTS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS) ARE AUTHORIZED BY THE DEBTOR, OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISIONS. ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT, WHICH MAY TAKE SUCH ACTION AS IT DEEMS APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED, EXCEPT AS SPECIFICALLY REFERENCED HEREIN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTOR AND ITS INTERNAL ACCOUNTING STAFF, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. THE DEBTOR'S PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH CREDITOR IS URGED TO REVIEW THE PLAN IN ITS ENTIRETY PRIOR TO VOTING ON IT.**

**THE DEBTOR MAKES NO REPRESENTATIONS WITH RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE INTEREST HOLDERS OR CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS OR INTERESTS UNDER THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED BY THE DEBTOR. CREDITORS AND INTEREST HOLDERS ARE ENCOURAGED TO SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS IF THEY HAVE ANY SUCH QUESTIONS.**

**IN RELIANCE ON THE EXEMPTION FROM REGISTRATION PURSUANT TO BANKRUPTCY CODE § 1145, ANY SECURITIES OFFERED AND ISSUED PURSUANT TO THE PLAN, IF CONSUMMATED, HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION (THE "<u>SEC</u>") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR SIMILAR STATE LAWS, NOR HAVE THE SECURITIES BEEN APPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION. NEITHER THE SEC NOR THE STATE SECURITIES COMMISSION HAS DETERMINED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.**

**HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE EXHIBITS, PRIOR TO VOTING ON THE PLAN.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL CONTROL.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR THE HOLDERS OF CLAIMS OR EQUITY INTERESTS.**

# ARTICLE I.
# INTRODUCTION

This Disclosure Statement is submitted by Ranch 967 LLC (the "Debtor"), the chapter 11 debtor-in-possession in the above-captioned Case, in connection with the Debtor's efforts to solicit votes necessary to confirm the Debtor's Plan of Reorganization (the "Plan"). A copy of the Plan is included with the materials supplied in the packet you have received.

## 1.1    Filing of the Debtor's Chapter 11 Case

On March 3, 2015 (the "Petition Date" or the "Filing Date"), Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("Court" or "Bankruptcy Court"). The Debtor continues to manage its affairs as a debtor-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108. This Disclosure Statement and the accompanying Plan are filed on behalf of the Debtor.

## 1.2    Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to provide you, as the holder of a Claim against the Debtor, with information to enable you to make a reasonably informed decision on the Plan before exercising your right to vote to accept or reject the Plan.[1]

On September 9, 2015, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Claims against the Debtor to make an informed judgment to accept or reject the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THIS INFORMATION OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN.**

You should read all of this Disclosure Statement before voting on the Plan. **HOWEVER, THE DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN ITSELF BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS IN THEIR ENTIRETY FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

You are urged to consult with your own financial and other advisors in deciding whether to vote to approve or reject the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to use any information concerning the Debtor or their businesses other than the information contained in this Disclosure Statement.

---

[1] Capitalized terms that are not defined in the Disclosure Statement are defined in the Plan.

About this Disclosure Statement:

•	The statements contained in this Disclosure Statement are made as of the date that the Bankruptcy Court enters an order approving this Disclosure Statement, unless another time is specified in this Disclosure Statement. Neither the delivery of this Disclosure Statement nor any action taken in connection with the Plan implies that the information contained in this Disclosure Statement is correct as of any time after that date.

•	Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Disclosure Statement includes the masculine, feminine and neuter; (b) references to articles and sections (other than in connection with the Bankruptcy Code, the Bankruptcy Rules, another specified law or regulation or another specified document) refer to the articles and sections of this Disclosure Statement; and (c) "including" means "including, without limitation."

•	Many capitalized words used in this Disclosure Statement have been defined in the context of the provisions in which they first appear within this Disclosure Statement. Any other capitalized terms used in this Disclosure Statement are intended to have the meanings ascribed to them in the Plan. Any capitalized term not defined in the context of a provision or in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

•	You may not rely on this Disclosure Statement for any purpose other than to determine how to vote on the Plan. Nothing contained in this Disclosure Statement constitutes or will be deemed to be advice on the tax or other legal effects of the Plan on holders of Claims or interests.

•	Certain of the information contained in this Disclosure Statement is forward-looking. This Disclosure Statement contains estimates and assumptions that may prove not to have been accurate and financial projections that may be materially different from actual future experiences.

•	Acceptance or rejection of the Plan is subject to a number of risks. See "Risk Factors" at Section 9 of this Disclosure Statement.

**1.3	<u>Plan Balloting and Confirmation Procedures</u>**

1.3.1	***Holder of Claims and Interests Entitled to Vote***

Only Classes of Claims and interests that are (i) "impaired" by a plan of reorganization or liquidation and (ii) entitled to receive a distribution under such a plan are entitled to vote to accept or reject a plan under the Bankruptcy Code. In this case, the holders of Claims in Classes 1 through 7 are impaired, along with the holders of Equity Interests in Class 8 and are entitled to vote to accept or reject the Plan.

### 1.3.2    *Voting Procedures*

If you are entitled to vote to accept or reject the Plan, a Ballot (the "**Ballot**") for acceptance or rejection of the Plan is enclosed. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED TO THE HOLDERS OF CLAIMS IN CLASSES 1 THROUGH 7 AND THE HOLDERS IN INTERESTS IN CLASS 8, BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN. If you are the holder of a Claim in one of these Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you are a party in interest and have any questions concerning the Disclosure Statement and exhibits hereto, the Plan or the voting procedures in respect thereof, please contact:

Eric J. Taube/Morris D. Weiss

TAUBE SUMMERS HARRISON TAYLOR MEINZER BROWN LLP

100 Congress Avenue, 18th Floor

Austin, Texas 78701

(512) 472-5997

(512) 472-5248 (FAX)

After carefully reviewing this Disclosure Statement, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan, then return the Ballot to the Debtor's counsel, at the address set forth on the Ballot, by **5:00 p.m.**, (Prevailing Central Time) on October 9, 2015, 2015. Any Ballot not indicating an acceptance or rejection will be deemed an acceptance of the Plan. You may also return your Ballot by courier or fax by following the instructions on the Ballot. **ANY BALLOTS RECEIVED BY THE DEBTOR'S COUNSEL AFTER 5:00 P.M., PREVAILING CENTRAL TIME, ON OCTOBER 9, 2015, WILL NOT BE COUNTED, UNLESS THIS DATE IS EXTENDED BY THE BANKRUPTCY COURT.**

### 1.3.3    *Voting Requirements for Class Acceptance of the Plan*

YOUR ACCEPTANCE OF THE PLAN IS IMPORTANT. In order for the Plan to be "accepted" by Creditors and interest holders, at least sixty-six and two-thirds percent (66.66%) in amount of Allowed Claims and more than fifty percent (50%) in number of Allowed Claims voting in each Class must accept the Plan. By not voting, a Creditor favoring acceptance of the Plan jeopardizes confirmation.

### 1.3.4    *Confirmation Hearing*

The Bankruptcy Court has entered an order fixing **October 15, 2015, at 9:30 a.m.** (Prevailing Central Time), Bankruptcy Courtroom for the Hon. Tony M. Davis, 903 San Jacinto, Austin, Texas as the date, time and place for the initial commencement of a hearing on confirmation of the Plan, and fixing **October 9, 2015 at 5:00 p.m.**, (Prevailing Central Time), as the time by which all objections to confirmation of the Plan, which must be accompanied by a memorandum of authorities, must be filed with the Bankruptcy Court and served on counsel for the Debtor. The confirmation hearing may be adjourned from time to time without further notice

except for the announcement of the adjourned time and date at the confirmation hearing or any adjournment thereof.

Section 1128(a) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, conform to Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court, set forth the name of the objecting party, the nature and amount of the Claim or Interest held or asserted by the objecting party against the Debtor's Estate, the basis for the objection and the specific grounds thereof.  The objection, together with proof of service thereof, must then be filed with the Bankruptcy Court, with copies served upon the following and upon the Service List in this case:

Eric J. Taube/Morris D. Weiss

TAUBE SUMMERS HARRISON TAYLOR MEINZER BROWN LLP

100 Congress Avenue, 18th Floor

Austin, Texas 78701

**UNLESS AN OBJECTION IS TIMELY AND PROPERLY SERVED AND FILED BY OCTOBER 9, 2015 AT 5:00 P.M. (PREVAILING CENTRAL TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**ARTICLE II.**
**DEBTOR'S BACKGROUND AND FINANCIAL PICTURE**

### 2.1     General

Debtor is a Delaware Limited Liability Company authorized to do business in Texas and formed to acquire and develop approximately 1,559 acres of real estate located in Dripping Springs, Texas.  Its managing members are Brady Oman of Austin, Texas and Frank Carmel from Bethesda, Maryland.  Mr. Oman was to be the local development partner for the property responsible for development and sales and Mr. Carmel was a significant investor in the property providing necessary capital to complete the acquisition of the property.  The other members of the Debtor are Susan Wise and Connor Oman, both of Austin, Texas.

### 2.2     History of Debtor and Causes of Bankruptcy Filing

The Debtor was formed on February 8, 2013, for the purposes of acquiring, developing and selling an approximately 1,559 acre tract of land in the Texas Hill Country and located in Dripping Springs, Hays County, Texas (the "**Project**").  The Project is subject to a Conservation Easement between the prior owner (N-Hays Investors I, L.P.) and the City of Austin that provides both benefits and burdens to the land.  The Debtor's intent was to subdivide the Project into 15 large executive ranches, build the access road to the individual ranches, install underground electrical access, an entrance gate and other improvements to the property originally planned to be known as "O Bar Ranch".  The Debtor purchased the Project for $10,100,000.00, financed by a loan from a consortium of lenders located in Texas (collectively, the "**Lender**") under a single loan document in the total amount of $10,296,000 (which included the payment of a four percent (4%) origination fee as well as a purchase money lien from the

seller of the property in the amount of $100,000.  The purchase was consummated on November 26, 2013.  Following the purchase, the Debtor began developing the Project, including providing for all of the engineering and entitlements, building the approximately two miles of spine road through the property providing access to the 15 ranches, entitling, engineering and platting the fifteen ranches, drainage and other improvements, along with other physical and legal matters typically associated with a residential real estate development.  The Project was platted and the plat was recently placed of record.  A Wildlife Management Plan was established for the Project to maintain beneficial real estate tax treatment, and the Wildlife Management Plan has been implemented and maintained.

The success of the Project was predicated upon a quick development of the access road and the sale of a number of individual ranches during the 12 months following closing in order to be successful and pay the effective non-default interest rate of 14% on the primary loan on the Project.  At the outset of the acquisition, Brady Oman, the local development partner and co-managing member, was advised and understood that there were approximately five buyers who had vetted the Project and were ready to purchase ranches.  Although a limited marketing program was started while road construction was underway, shortly after closing on the purchase of the Property (early January 2014), Mr. Oman was diagnosed with life-threatening leukemia.  The leukemia required chemo-therapy, extended periods of time hospitalized in or within close proximity at M.D. Anderson in Houston, Texas and ultimately a stem-cell transplant making it impossible for Mr. Oman to continue in his role as the managing developer and/or involving himself in the selling of the individual ranches.   Additionally, this illness and the sudden unavailability of Mr. Oman resulted in some stigma on the Project apparently creating some doubt in the minds prospective buyers as well as the local brokerage community as to the ultimate viability of O Bar Ranch, increasing the difficulty of sales of individual ranches due to lack of a seasoned developer.  Furthermore, while Mr. Carmel was willing to and has invested significant additional sums into the continuation of the developing and marketing efforts for the Project, requests to the Lender to apply such additional funds to additional infrastructure costs, marketing and sales efforts were refused by the Lender who was accruing interest at the default rate of 18% on their loan.  Mr. Carmel funded additional interest payments on the Old A&D Loan until May 31, 2014 when it became apparent that a viable marketing and sales effort was not being undertaken by the local brokers marketing the Project due to their own uncertainty, and absent an infusion of significant additional equity or a bulk sale of the Project, an appropriate exit strategy was not clear.

From June 2014 through February 2015 Mr. Carmel through the assistance of the local brokers (Carlotta McLean and Tim Riley, who have a stake in the Project through the making of a $193,000 loan at closing) began efforts to bulk sale the Project to a third party or solicit additional equity for the Project.  Though the Debtor has been successful in taking steps to develop the Project and generate interested buyers of both lots and bulk sales, the Lenders declined to extend the maturity of the indebtedness and to allow any orderly work-out of the development without the payment of substantial interest and principal reduction.  The debt originally matured on November 25, 2014, and the Debtor did not have the cash to pay the loan at that time either from operations or capital contributions from partners.  Though the Debtor and the Lender engaged in a series of negotiations, the Lender posted the Project on multiple occasions for foreclosure, most recently for a sale to be conducted on March 3, 2015. The Debtor filed its voluntary petition under Chapter 11 of Title 11 of the United States Code on March 3,

2015 to stop the foreclosure in order to preserve value for the benefit of all stakeholders in the Debtor.

**Lenders' View**

The Lenders, a group of four Central Texas families, ***strongly*** disagree with many of the Debtor's inaccurate statements and misrepresentations as to the facts listed in the foregoing paragraph. After not having received any payment on the Loan for over sixteen months (and never having made a reduction of the principal amount of the loan), the Lenders ultimately lost confidence in the Debtor's ability to perform as they had previously agreed. As for specific misstatements noted in the above paragraph, by way of illustration but not limitation, the Lenders represent the following: (i) the interest rate on the loan was fourteen percent (14%) per annum – not eighteen percent (18%); (ii) the first three interest payments, due on March 1, 2014, April 1, 2014, and May 1, 2014, were paid out of the escrow because the Debtor could not otherwise make the payments – and such payments exhausted the escrow balance; (iii) throughout the course of the loan history, the Lenders were in constant communication with the Debtor's representatives (and as a result of Mr. Oman's illness and ongoing treatments, the Lenders were specifically requested to channel all communications through Ms. McLean or Mr. Riley – which they did); and (iv) the Lenders postponed foreclosure of the collateral securing the Note for months in hopes that the Debtor and its principals could find an acceptable solution, which of course, they did not. Importantly, the Lenders never took any action to discourage any interest by a potential buyer for the property or infusion of equity by any party for the Project. In summary, just as the Debtor's principals became unwilling to advance any additional capital to save their investment, finally so too were the Lenders unwilling to advance additional capital for the Project, and instead, they simply sought the enforcement of the remedies the Debtor had contractually provided them when the loan was made.

**Debtor's Response**

The Debtor respectfully disagrees with the Lender's characterization.

**ARTICLE III.**
**SELECTED FINANCIAL INFORMATION,**
**PROJECTIONS AND VALUATION ANALYSIS**

**3.1**     **General**

This section provides summary financial information concerning the Debtor, its assets and potential sources of recovery for creditors. The information is based on information available as of the date of this Disclosure Statement. Any forward-looking projections, including analysis and valuation of Litigation Claims, is based upon the Debtor's best estimates and belief but, as with any projections, may vary in the future.

**3.2**     **Financial Projections of the Reorganized Debtor; Sources and Uses**

Attached hereto as **Exhibit A** is a sources and uses chart for the Debtor. Attached hereto as **Exhibit B** are financial projections for the Debtor that reflect the anticipated timing and amount of distributions.

### 3.3    Valuation and Description of Debtor's Assets

The Debtor has retained the Aegis Group, Inc., a property appraisal company located in Austin, Texas, to perform an appraisal of the Project. The appraisal is being performed by John Coleman of Aegis Group, Inc., who holds the MAI designation. The market value of the approximately 1,559 acres as of June 19, 2015 on an "as is" basis was estimated to be $15,400,000. The Debtor believes it can achieve higher sales value through an effective marketing process.

As of the date of the filing of this Disclosure Statement, such appraisal has not yet been completed.

## ARTICLE IV.
## PROCEEDINGS IN THE CHAPTER 11 CASE

### 4.1    Commencement and Administration of the Case

The Debtor's Chapter 11 Case was commenced on March 3, 2015. The following is a description of the more significant matters to have come before the Court.

#### 4.1.1    *Approval of Employment of Taube Summers Harrison Taylor Meinzer Brown as Debtor's Counsel*

On April 16, 2015, the Bankruptcy Court approved the retention of Taube Summers Harrison Taylor Meinzer Brown as counsel to the Debtor. As counsel for the Debtor, the firm is entitled to seek interim and final compensation from the Estate of Debtor upon duly noticed application and after a hearing before the Court.

#### 4.1.2    *No Unsecured Creditors' Committee*

On March 31, 2015, the United States trustee filed its notice that it did not intend to appoint a committee of unsecured creditors in the Chapter 11 Case.

#### 4.1.3    *Retention of Appraiser*

On April 14, 2015, the Debtor filed its application to retain Aegis Group, Inc. as its appraiser. Pursuant to a hearing held on April 22, 2015, the Court granted the referenced application.

#### 4.1.4    *Motion to Determine that Debtor is a Single Asset Real Estate Case*

On April 7, 2015, the Lender filed its Motion of Rockafellow Investments, LLC, a Texas Limited Liability Company, Jody Wingrove, Jason Parrish, Allison Germer Buras, Germer Properties LLC, and Equity Trust Company, Custodian FBO Lawrence J. Germer IRA for an Order Declaring That the Ranch 967 LLC Bankruptcy Case is a Single Asset Real Estate Proceeding Subject to 11 U.S.C. §362(D)(3). On May 4, 2015, this Court granted the referenced motion.

## ARTICLE V.
## SUMMARY OF THE DEBTOR'S PLAN

**5.1**     **Explanation of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, the plan proponent attempts to restructure a debtor's financial affairs or effectively liquidate the debtor's assets for the benefit of the creditors, equity interest holders and other parties in interest. The Chapter 11 plan is the debtor's agreement with its creditors containing the terms and conditions for the operation and/or liquidation of the properties and assets of the debtor and the treatment of the Claims and interests of creditors and parties-in-interest.

According to Section 1125 of the Code, acceptances of a Chapter 11 plan may be solicited by the debtor only after a written disclosure statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.

**5.2**     **Terms of the Plan Control**

The following represents the Debtor's best efforts to describe the treatment afforded the Claims of the Creditors in various Classes. Creditors should be aware that the terms of the Plan control the treatment of all Claims. In the event of any inconsistencies between the Plan and this Disclosure Statement, the terms of the Plan shall be, in all events, determinative. The Debtor urges all Creditors to read the Plan for a complete understanding of the treatment of their Claims.

**5.3**     **New Financing of the Debtor**

The Plan is predicated on a recapitalization of the Debtor, the terms of which are summarized in the Letter of Intent. Pursuant to the Letter of Intent, the New Lender will provide up to $3,000,000 in financing secured by a junior lien (subordinated to all prior perfected Liens) on the Project. The proceeds of this issuance will be available to be used to (a) fund the Interest Reserve, and (b) pay for the Capital Improvements to the extent that sufficient funds are not available for such purpose after the payment of the Lot Release Price to the Lender from the sale of Lots.

**5.4**     **Claims**

As provided in Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Expense Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Section 3.02 of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

Administrative Claims. Each holder of an Allowed Administrative Claim (except any holder that agrees to a lesser or otherwise different treatment) shall be paid in full, in Cash, in full satisfaction of such Claim, on the later of the Effective Date or the date on which such Administrative Claim becomes an Allowed Claim, *provided, however*, that (a) Allowed Administrative Claims representing (1) post-petition liabilities incurred in the ordinary course of

business by the Debtor or (2) post-petition contractual liabilities arising under loans or advances to the Debtor, whether or not incurred in the ordinary course of business, shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto and (b) Professional Fee Claims shall be paid on the later of (i) thirty (30) days after the Effective Date, or (ii) thirty (30) days following the date of a Final Order determining and Allowing such Claim as a Professional Fee Claim. As of the date August 31, 2015, the Debtor had incurred approximately $104,000.00 of Administrative Claims (of which approximately $98,000 is attributable to Taube Summers and $5,500 is attributable to The Aegis Group (the appraiser)) and estimates that it will incur an additional $75,000.000 in Administrative Expense Claims between September 1, 2015 and the Effective Date of the Plan for a total of approximately $175,000.00.

Statutory Fees. On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. Section 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash equal to the Allowed amount of such Administrative Expense Claims. All fees payable pursuant to 28 U.S.C. Section 1930 subsequent to the Confirmation Date will be paid by the Reorganized Debtor in accordance therewith until the entry of a Final Decree.

Priority Tax Claims. Notwithstanding anything to the contrary contained within the Plan or approved Disclosure Statement, the Priority Secured Tax Claims owing to Hays County and Hays CISD (collectively, the "**Taxing Entities**") shall be paid by the Debtor, pursuant to the provisions of 11 U.S.C. §1129(a)(9)(C), in equal monthly installments, commencing thirty days from the Effective Date and ending sixty (60) months from the petition date. The Claims shall bear interest at the statutory rate of 12% per annum from the date of filing of this case until said taxes are paid in full.

In the event that any Lot(s) which is secured by the Priority Secured Tax Claims is sold, the unpaid taxes secured by the tract(s) shall be paid in full upon the sale of the property.

The Taxing Entities shall retain all Liens until such taxes are paid in full. Hays CISD has filed a proof of claim in the amount of $3,186.42. If those are the only unpaid priority tax claims, such amount will be paid in full on the Effective Date of the Plan.

Default shall occur if one monthly installment due to the holders of the Allowed Priority Tax Claims under the confirmed Plan is not paid by Debtor or if post-confirmation taxes are not paid timely pursuant to state law. In the event of default, the Taxing Entities or either of them shall send written notice of default to Debtor's attorney and Debtor (or the Reorganized Debtor, as the case may be). If the default is not cured within twenty (20) days after notice of the default is mailed, the Taxing Entities may proceed with state law remedies for collection of all amounts due under state law pursuant to the Texas Property Tax Code.

## 5.5 **Classification and Treatment**

In accordance with Bankruptcy Code § 1123(a)(1), all Claims and Equity Interests are placed in the Classes described below for all purposes, including voting on, confirmation of, and distributions under, the Plan as follows:

| Class No. | Class Description | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Restructured A&D Loan | Impaired | Entitled to Vote |
| Classes 2-6 | Allowed Secured Claims | Impaired | Entitled to Vote |
| Class 7 | Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Old Equity | Unimpaired | Not Entitled to Vote |

5.5.1   *Class I – Restructured A&D Loan.*

(1)   The Restructured A&D Loan shall have the following terms:

   (a)   The New A&D Balance.

   (b)   Interest rate of no greater than 5% (simple) per annum.

   (c)   Maturity Date of the fifth anniversary of the Effective Date.

   (d)   Interest only payments and Lot Release Price repayment terms below.

   (e)   In the event of an uncured default, the default rate of interest will be 18% per annum.

   (f)   Repayment of Principal/Lot Release Prices. The Debtor (or the Reorganized Debtor, as the case may be) shall be entitled to partial releases from the Liens in accordance with the provisions of this Section. In connection with any such partial release, Debtor (or the Reorganized Debtor, as the case may be) shall be entitled to a release of the Lien for a payment by Debtor to the Lender for each Lot of (i) sixty-five per cent (65%) of the full sales price of the Lot for each of the first three (3) Lots to be released or $1,000,000.00 whichever is greater for application on the principal of the Restructured A&D Loan, plus (ii) all accrued and unpaid interest on the amount of principal so paid with the balance of the sales price after the payment of reasonable and necessary closing costs for such Lots not to exceed seven per cent (7%) of the gross sales price of such Lots. Debtor (or the Reorganized Debtor, as the case may be) shall be entitled to a release of the Lien for a payment by Debtor (or the Reorganized Debtor, as the case may be) to the Lender for each of the next seven (7) Lots to be released of (i) seventy-five per cent (75%) of the full sales price of the Lot to be released for application on the principal of the Restructured A&D Loan, plus (ii) all accrued and unpaid interest on the amount of

principal so paid with the balance of the sales price after the payment of reasonable and necessary closing costs for such Lots not to exceed seven per cent (7%) of the gross sales price of such Lots. Debtor (or the Reorganized Debtor, as the case may be) shall be entitled to a release of the Lien for a payment by Debtor (or the Reorganized Debtor, as the case may be) to the Lender for each of the remaining Lots after the sale of the first ten (10) Lots of (i) ninety three per cent (93%) of the full sales price of the Lot to be released for application on the principal of the Note, plus (ii) all accrued and unpaid interest on the amount of principal so paid with the balance of the sales price, if any, after the payment of reasonable and necessary closing costs for such Lots not to exceed seven per cent (7%) of the gross sales price of such Lots. The minimum sales price for each Lot to be released under this Section shall be $1,700,000.00 for Lots , 9, 10, 11, 13, and 14, $1,500,000.00 for Lots 2, 3, 4, 5, and 15, and $1,300,000.00 for Lots 1, 6, 7, 8, and 12.  The release prices for the Lots described in this section shall be referred to herein as the "**Lot Release Price**"). At such time as the Restructured A&D Loan has been satisfied, the New A&D Lender shall be required to deliver a release of lien to the Debtor, or the Reorganized Debtor, as the case may be.

(g)  The Restructured A&D Loan may be prepaid in whole or in part at any time without penalty.

(2)  The Debtor has reflected in its schedules that as of the Petition Date the amount outstanding under the Old A&D Loan was $11,494,717.60.  The various holders of the Old A&D Loan filed proofs of claims as follows: Jason Parrish ($1,228,338.79); Germer Properties, LLC ($1,171,516.82); Jody Wingrove ($334,843.90); Rockafellow Investments, LLC ($6,813,846.86); Allison Germer Buras ($223,373.72); and Equity Trust Company Custodian FBO Lawrence J. Germer IRA ($1,728,570.65).  The total of the foregoing amounts is $11,500,490.

(3)  This Class is impaired.

5.5.2  *Classes 2 through 6 – Allowed Secured Claims.*

Each holder of an Allowed Secured Claim shall be paid in full, with interest at the rate of five percent per annum (simple interest) in accordance with the following schedule:

Following full repayment of the Restructured A&D Loan, the holders of Allowed Secured  Claims shall receive distributions from Net Lot Sales Proceeds on a Pro Rata basis until such Allowed Secured  Claims have been satisfied in full and a release of lien has been received by the Debtor, or the

Reorganized Debtor, as the case may be.  The Allowed Secured Claims shall have a maturity date on the third anniversary of the Effective Date.

5.5.2.1    Class 2 shall consist of the Allowed Secured Claim of Dworaczyk Enterprises, LLC d/b/a Dirt Works.  Scheduled by the Debtor as holding a claim in the amount of $126,814.10 (with proof of claim filed in the identical amount).

5.5.2.2    Class 3 shall consist of the Allowed Secured Claim of SMA Asphalt, LLC d/b/a Lone Star Paving.  Scheduled by the Debtor as holding a claim in the amount of $158,519.68 (with proof of claim filed in the identical amount).

5.5.2.3    Class 4 shall consist of the Allowed Secured Claim of N-Hays Investors, LP.  Scheduled by the Debtor as holding a claim in the amount of $110,060.27

5.5.2.4    Class 5 shall consist of the Allowed Secured Claim of Pape-Dawson Engineers.  Scheduled by the Debtor as holding a claim in the amount of $120,903.46.

5.5.2.5    Class 6 shall consist of the Allowed Secured Claim of Plateau Land & Wildlife Management.  Scheduled by the Debtor as holding a claim in the amount of $8,377.34 (with proof of claim filed in the amount of $10,183.81).

5.5.2.6    These Classes are impaired.

5.5.3    *Class 7 – Unsecured Claims.*

Each holder of an Allowed Unsecured Claim shall receive the following treatment:

(a)    The holders of the Allowed Unsecured Claims shall be paid in full, without interest, on a Pro Rata Basis from any Net Lot Sales Proceeds remaining after satisfying (i) the Restructured A&D Loan under Class 1, (ii) the Allowed Secured Claims under Class 2 through 7, and (iii) the New Credit Facility (the "**Remaining Net Lot Sales Proceeds**").  If there are no Remaining Net Lot Sales Proceeds then there will be no distributions to the holders of Allowed Unsecured Claims.   If the Remaining Net Lot Sales Proceeds are insufficient to satisfy the Allowed Unsecured Claims in full then such proceeds shall be distributed on a Pro Rata basis.   The Debtor's schedules reflect $960,578.81 in unsecured claims.

(b)    This Class is impaired.

5.5.4   *Class 8 – Equity Interests.*

Holders of Equity Interests in the Debtor will receive retain their interests in the Debtor and their rights under the Operating Agreement.  The Holders of Equity Interest (other than Frank Carmel) are not entitled to receive the Preferred Return.  This Class is unimpaired.  Frank Carmel may assert the Side Letter Amounts in this class.

**5.6     Discharge of Claims.**

Except as otherwise provided in the Plan, the rights afforded in the Plan and the payments and distributions to be made thereunder are in complete exchange for, and in full satisfaction and release of, all existing Claims, debts and obligations of any kind, nature or description whatsoever of or against the Debtor or any of their assets or property to the fullest extent permitted under Section 1141 of the Bankruptcy Code.  Upon the Effective Date, and except as otherwise provided in the Plan, all existing Claims against the Debtor and the Reorganized Debtor shall be and shall be deemed to be discharged. Subject to the provisions of the Plan, all holders of Claims or Equity Interests shall be precluded from asserting against the Debtor, or any of its assets or property, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim or proof of Equity Interest.  Subject to the provisions of the Plan, upon the Effective Date, the Debtor shall be deemed discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim or Equity Interest based upon such obligation is filed or deemed filed under Section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt is Allowed under Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim or Equity Interest based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor and the Reorganized Debtor.  In accordance with Section 524 of the Bankruptcy Code, the discharge provided for hereunder shall void any judgment against the Debtor to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtor or their Property to the extent it relates to a discharged Claim.

**5.7     Plan Releases and Exculpation.**

None of the Debtor, Reorganized Debtor, its counsel, holders of Equity Interests, or any other party in interest, or any of their respective members or former partners, general partners, members, agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, shall be liable for any act or omission in connection with, relating to or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan (the "Chapter 11 Activities"), except for their acts or omissions constituting willful misconduct or gross negligence, as finally determined by a court of competent jurisdiction, and in all respects are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities in connection with the Chapter 11 Activities.  No holder of a Claim, or any other party in interest, including their respective agents, employees, representatives, financial advisors, attorneys or affiliates, have any

right of action against the Debtor, the Reorganized Debtor, or its counsel for any act or omission in connection with the Chapter 11 Activities, except for their acts or omissions constituting willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.

## ARTICLE VI.
## IMPLEMENTATION OF PLAN

### 6.1 Summary of Implementation of the Plan

All Cash necessary for the Reorganized Debtor to make payments pursuant to the Plan shall be obtained from the New Credit Facility.

### 6.2 The Reorganized Debtor's Obligations Under the Plan

The Reorganized Debtor shall perform all of the obligations under the Plan, including obligations to pay or otherwise satisfy the Allowed Claims. From and after the Effective Date, the Reorganized Debtor shall, among other things:

(1) administer the Plan and take all steps and execute all instruments and documents necessary to effectuate the Plan;

(2) reconcile Claims and resolve Disputed Claims, and administer the Claims allowance and disallowance processes as set forth in the Plan, including, without limitation, objecting to, prosecuting, litigating, reconciling, settling and resolving Claims and Disputed Claims in accordance with the Plan;

(3) make decisions regarding the retention, engagement, payment and replacement of professionals, employees and consultants;

(4) administer the Distributions under the Plan, including (i) making Distributions in accordance with the terms of the Plan and (ii) establishing and maintaining the various Reserves;

(5) exercise such other powers as necessary or prudent to carry out the provisions of the Plan;

(6) invest any Cash pending Distribution;

(7) file appropriate tax returns; and

(8) take such other actions as may be necessary or appropriate to effectuate the Plan.

On the Effective Date, Debtor will be managed though by the new managing member to be identified in the Plan Supplement. Following the Effective Date, the Debtor may pay its post Effective Date operating expenses in the ordinary course of its business without notice or orders of this Court.

**6.3     Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan or the making or delivery of any deed or other instrument or transfer under, in furtherance of, or in connection with the Plan, including without express or implied limitation, any transfers to or by the Reorganized Debtor, shall not be subject to any transfer, sales, stamp or other similar tax.

**6.4     Claims Objections**

Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed before the Effective Date, the Reorganized Debtor may object to the Allowance of any Claim against the Debtor or seek estimation of any Claim on any grounds permitted by the Bankruptcy Code. All objections to Claims must be brought by filing the appropriate pleading in the Bankruptcy Court before the first Business Day that is 60 days after the Effective Date, but the Bankruptcy Court may approve a later date on the Reorganized Debtor's motion filed (but not necessarily heard) before the first Business Day that is 60 days after the Effective Date. At this point, the Debtor is not aware of any unsecured claims that it intends to contest. Debtor may contest the amount of attorney's fees and interest sought by any creditor. ***Debtor reserves the right to object to or seek estimation of any Claims.***

**6.5     Contingent Claims**

Until a Contingent Claim becomes an Allowed Claim or is Disallowed, the Claim will be treated as a Disputed Claim for all purposes under the Plan. The holder of a Contingent Claim will be entitled to a distribution under the Plan only when the Contingent Claim becomes an Allowed Claim. Any Contingent Claim for reimbursement or contribution held by a Person that may be liable with the Debtor is Disallowed as of the Effective Date if: (a) that Creditor's Claim is Disallowed; (b) the Claim for reimbursement or contribution is contingent as of the Effective Date; or (c) that Person asserts a right of subrogation to the rights of the Creditor under Bankruptcy Code § 509.

**6.6     Distributions on Allowance or Disallowance of Disputed**

No Distributions will be made to any holder of a Claim unless and until the Claim becomes an Allowed Claim. If a Claim is not an Allowed Claim as of the Effective Date, Distributions on account of that Claim will commence only when the Claim becomes an Allowed Claim after the Effective Date or as otherwise specifically provided in this Plan. If a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor will make a Distribution in accordance with the terms of this Plan applicable to Claims of the Class in which that Claim resides.

**6.7     Undeliverable/Returned Distributions**

Any Distribution to be made to a Creditor will be sent to that Creditor at (i) the address set forth on the proof of Claim filed for such Creditor, or (ii) if no proof of Claim is filed, at the address set forth on the Debtor's schedules. In the event that a Distribution as herein provided is returned as undeliverable, or a Distribution is returned on account of there being no payment due

to the affected Creditor, the Reorganized Debtor shall hold such Distribution for the affected Creditor for a period of 60 days following the Date of that Distribution for the benefit of the Creditor. If the affected Creditor does not make a demand, in writing, for such unclaimed Distribution within the 60-day period, the Creditor shall forfeit all entitlement to the Distribution, and the Distribution shall revert to the Reorganized Debtor.

### 6.8    De Minimis Distributions

Any other provision of the Plan notwithstanding, the Reorganized Debtor shall not be required to make Distributions to holders of Allowed Claims in an amount less than $50.00 (unless such Allowed Claim is less than $50.00).  Cash allocated to an Allowed Claim but withheld from Distribution pursuant to this subsection shall be held by the Reorganized Debtor for the account of and future Distribution to the holder of such Allowed Claim.

### 6.9    Additional Charges

Except as may be expressly provided in the Plan or allowed by Final Order of the Bankruptcy Court, no interest, penalty, attorney's fee or late charge shall be allowed or paid with respect to any Claim.

### 6.10    Treatment of Executory Contracts and Unexpired Leases

#### (a)    Assumption or Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, any unexpired lease or executory contract that has not been previously assumed or rejected by the Debtor pursuant to an order of the Bankruptcy Court shall be deemed rejected by the Debtor under Sections 365(a) and 1123 of the Bankruptcy Code. *Debtor will file a list of contracts to be assumed prior to date of the Confirmation Hearing.* Entry of the Confirmation Order shall constitute approval of such assumptions or rejections, as the case may be, (as such lists may be amended, supplemented or modified on or before the Confirmation Date), pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume executory contracts and unexpired leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

#### (b)    Objections to Assumption and Assignments of Executory Contracts and Unexpired Leases. To the extent that any party to an executory contract or unexpired lease identified for assumption, or any other party in interest, (a) asserts arrearages or damages pursuant to § 365(b)(1) of the Bankruptcy Code in an amount different from the amount, if any, set forth in the Petition and Schedules, (b) has any objection to the proposed adequate assurance of future performance, if required, or (c) has any other objection to the proposed assumption, cure, or assignment of a particular executory contract or unexpired lease on the terms and conditions provided for herein, all such asserted arrearages and any other objections shall be filed and served within the same deadline and in the same manner established for filing objections to Confirmation.

Failure to assert any arrearages different from the amount set forth in the Schedules (or the exhibits thereto), or to file an objection within the time period set forth above, shall constitute

consent to the assumption, cure, and assignment on the terms provided for herein, including acknowledgment that (a) the Debtor (or its assignee) has provided adequate assurance of future performance, if required, (b) the amount identified for "cure," if any, is the amount necessary to compensate for any and all outstanding defaults or actual pecuniary loss under the executory contract or unexpired lease to be assumed, and (c) no other defaults exist under such executory contract or unexpired lease.

If an objection to assumption and assignment is filed based upon lack of adequate assurance of future performance or otherwise, and the Court determines that the Debtor cannot assume the executory contract or unexpired lease either as proposed or as may be proposed pursuant to a modified proposal submitted by the Debtor, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been rejected

(c)  **Payments Related to Assumption of Executory Contracts and Unexpired Leases**. Any monetary defaults, including claims for actual pecuniary loss, under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount, if any, as otherwise agreed by the parties or as ordered by the Bankruptcy Court. in Cash within 90 days following the Effective Date, or on such other terms as may be agreed to by the parties to such executory contract or unexpired lease.  In the event of a dispute regarding (a) the amount of any cure or pecuniary loss payment, (b) the ability of Reorganized Debtor to provide adequate assurance of future performance under the contract or lease to be assumed, if required, or (c) any other matter pertaining to assumption, the cure or pecuniary loss payments required by § 365(b)(1) of the Bankruptcy Code shall be made within a reasonable time following entry of a Final Order resolving the dispute and approving assumption.

(d)  **Bar Date for Rejection Damages**. If the rejection of an executory contract or unexpired lease pursuant to Article 6 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim, to the extent that it is timely filed and is a Allowed Claim, shall be classified in Class 7; provided, however, that the Unsecured Claim arising from rejection shall be forever barred and shall not be enforceable against a Debtor, Reorganized Debtor, their successors or properties, unless a proof of Claim is Filed and served on the Reorganized Debtor within 30 days after the date of the notice of the entry of an order of the Bankruptcy Court authorizing rejection of the executory contract or unexpired lease, which order may be the Confirmation Order.

(e)  **Contracts to be Assumed**.  Debtor is not required to designate contracts to be assumed or rejected until confirmation.

### 6.11  Pending Claims and Causes of Action

The following is a general discussion of the type and nature of claims and causes of action of the Estate:

NOTE: THE FOLLOWING DISCUSSION IS NOT INTENDED TO BE EXHAUSTIVE AND SHALL NOT LIMIT OR MODIFY ANY CLAIMS OR CAUSES OF ACTION OF THE ESTATE.

Some of the payments made by the Debtor to creditors within ninety (90) days of the filing of bankruptcy (or to an insider within one year of the filing of bankruptcy) may be subject to a claim for recovery as preferential transfers under 11 U.S.C. §547.

While the Debtor is unaware of any recoverable preferential transfers at this time, the Reorganized Debtor will retain the right to object to claims pursuant to 11 U.S.C. § 502(d) or pursue any preferences.  The statements and schedules filed by the Debtor reflect that no transfers were made in the 90 days prior to the Petition Date and that there were no transfers to insiders in the 1 year period prior to the Petition Date.

**ALL CLAIMS OF THE BANKRUPTCY ESTATE ARE BEING PRESERVED AND TRANSFERRED TO REORGANIZED DEBTOR UNDER THE PLAN.**

Any and all causes of action which the Debtor may have, including, but not limited to Avoidance Actions, which may be enforceable under any statute, shall be preserved and shall constitute Property of the Estate to be conveyed to Reorganized Debtor in accordance with the Plan.  The Court shall retain jurisdiction to determine all such causes of action.

**YOU MAY BE SUED IF:**

i)      You were or are a creditor and you received a payment on a prior debt within ninety (90) days before the Petition Date;

ii)     You were an insider of the Debtor and you received a payment on a prior debt within one (1) year before the Petition Date;

iii)    You received any payments or property from the Debtor for goods or services you did not deliver or provide before the Petition Date;

iv)     You received any payments of property from the Debtor without providing reasonably equivalent value;

v)      You received pre-payments, advances or deposits from the Debtor which you did not earn;

vii)    You were involved in pending litigation with the Debtor at the time of the Petition Date or have been sued thereafter;

viii)   You owe the Debtor any money under a contract or as a result of your breach of contract with the Debtor;

ix)     Potential claims against you or any of your affiliates are described or referred to in this Disclosure Statement; or

x)      The Debtor has any claims against you under state or federal law, whether in contract or in tort, whether known or unknown.

## ARTICLE VII.
## CONFIRMATION OF THE PLAN

### 7.1 Feasibility

As a condition to confirmation of a plan, Section 1129 of the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.

The ability of the Debtor to fund the amounts contemplated under the Plan is premised on the New Credit Facility.

### 7.2 Best Interests Test

In order to confirm the Plan, the Court must find that each holder of an impaired Claim or Equity Interest either (i) accepted the Plan or (ii) received or retained under the plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. In a typical Chapter 7 case the debtor ceases operations and a trustee is appointed to conduct an orderly liquidation of the Debtor's assets. The proceeds, net of trustee's fees and other costs and expenses incurred in conducting the liquidation, are distributed to creditors in accordance with their rights and statutorily prescribed priorities of payment.

If this Case was converted to a liquidation under Chapter 7, the Court would likely lift the automatic stay to permit the Lender to foreclose its Lien on the Project. The Debtor believes that it is highly unlikely that the Lender would bid more than the amount of the indebtedness, meaning other creditors would likely recover nothing unless a higher cash bidder appeared at the sale. Though possible, such bidders at this level (in excess of $11 million) rarely appear. If the Project did sell at foreclosure for an amount in excess of the debt, that amount would be returned to the Debtor and could be used to pay Creditors.

Based upon the foregoing liquidation analysis, Unsecured Creditors and Equity Interest holders would receive no Distributions on account of their Claims in a Chapter 7 liquidation. Under the Plan, those Creditors will receive Distributions more than they would get in a Chapter 7 Liquidation. The Plan proposes to pay Secured and Unsecured Creditors in full. Accordingly, Secured Creditors are receiving at least as much as they would get under a Chapter 7 liquidation.

## ARTICLE VIII.
## ALTERNATIVES TO THE PLAN

### 8.1 General

The Debtor believes that the Plan affords the holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan of reorganization; or (b) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Case. BASED UPON DEBTOR'S ASSESSMENT,

UNSECURED CREDITORS WOULD RECEIVE NO DISTRIBUTIONS IN A CHAPTER 7 CASE OR IN THE EVENT OF DISMISSAL OF THE CASE.

## 8.2    Alternative Plans

If the Plan is not confirmed, the Debtor or any other party in interest in the case could attempt to formulate and propose a different plan.  Other parties may propose alternative plans, but the Debtor does not believe that any other plan will provide a greater recovery for the Creditors than proposed by Debtor's Plan, or that any such plans will be feasible.

## 8.3    Liquidation Under Chapter 7 or Dismissal

If no Plan can be confirmed, this Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor.  The proceeds of the liquidation would be distributed to the respective holders of Claims against the Debtor in accordance with the priorities established by the Bankruptcy Code.  If the case were dismissed, the Lender would likely foreclose on the Project.

As set forth in the preceding Article, the Plan is clearly superior to a Chapter 7 liquidation or dismissal of the case. No separate liquidation analysis has been prepared as an exhibit.

## ARTICLE IX.
## RISK FACTORS

### 9.1    Bankruptcy Risks

#### 9.1.1    *Non-Confirmation of Plan*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.

#### 9.1.2    *Non-Occurrence or Delayed Occurrence of the Effective Date*

Although the Debtor believes that the Effective Date will occur after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived, then the Confirmation Order will be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor' obligations with respect to Claims and Interests would remain unchanged.

**9.2**     **Plan Risks**

9.2.1   *Variance from Financial Projections and Feasibility Analysis*

The Debtor has prepared financial projections for the Reorganized Debtor based on certain assumptions. The projections and the feasibility analysis have not been compiled, audited, or examined by independent accountants and the Debtor makes no representations or warranties regarding the accuracy of the projections or the feasibility analysis or the ability to achieve forecasted results. Many of the assumptions underlying the projections and the feasibility analysis are subject to significant uncertainties and are beyond the control of the Debtor, including, but not limited to, sales, absorption rates, and other anticipated market and economic conditions. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate financial results. Projections and feasibility analyses are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the projections and the feasibility analysis may be inaccurate in any material respect. Therefore, the actual results achieved, the capital structure, and the recapitalization process, among other things, may vary significantly from the forecasts, and the variations may be material.

9.2.2   *Compliance with Terms of Restructured Debt*

The Plan provides that the Debtor will perform its financial obligations under the restructured debt.  If the Debtor's actual financial performance does not meet its cash flow projections, however, and if other sources of liquidity are not available, there is a risk that the Debtor might be unable to pay interest and principal payments on the reinstated obligations.  In the event of a default under the Plan, such default in the performance of the Plan shall not automatically result in the termination of the Plan or constitute a revocation of the Confirmation Order.  In the event of a default by the Debtor under the Plan, the Creditors may exercise any rights granted to them under documents executed to evidence the Plan or any rights available to them under applicable non-bankruptcy law, following notice and an opportunity to cure. In the absence of a document executed to evidence the Plan, the Plan may be enforced as a contract by filing suit to collect the payments required under the Plan as if the Plan were a promissory note or other written contract.

**9.3**     **Business Risks**

9.3.1   *Future Economic Conditions*

Economic conditions have been more robust in Austin and in Texas than in other parts of the country.  There can be no assurance that this will continue.

9.3.2   *Effectiveness of Business Strategy*

The Reorganized Debtor may not be able to effectively implement its business strategy.

## ARTICLE X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 10.1    Income Tax Consequences

The transactions contemplated by the confirmation of the Plan may have an impact on the tax treatment received with respect to distributions under the Plan.  That impact may be adverse to a creditor or interest holder.  The Debtor has attempted to structure the Plan to preserve any valuable tax attributes.

An analysis of federal income tax consequences of the Plan to Creditors, Equity Interest holders, and the Debtor requires a review of the Internal Revenue Code, the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice.  The Plan and its related tax consequences are complex. Neither the Debtor nor the Debtor's counsel have requested a ruling from the Internal Revenue Service with respect to these matters.  Accordingly, no assurance can be given as to the IRS's interpretation of the Plan.

THE TRANSACTIONS CONTEMPLATED BY THE CONFIRMATION OF THE PLAN MAY HAVE AN IMPACT ON THE TAX TREATMENT OF ANY CREDITOR OR INTEREST HOLDER.  THAT IMPACT MAY BE ADVERSE TO THE CREDITOR OR INTEREST HOLDER.  NOTHING HEREIN IS INTENDED TO BE ADVICE OR OPINION AS TO THE TAX IMPACT OF THE PLAN ON ANY INDIVIDUAL CREDITOR OR INTEREST HOLDER.  EACH CREDITOR OR INTEREST HOLDER IS CAUTIONED TO OBTAIN INDEPENDENT AND COMPETENT TAX ADVICE PRIOR TO VOTING ON THE PLAN.

## ARTICLE XI.
## JURISDICTION OF THE COURT

### 11.1    General Retention of Jurisdiction

Until the Bankruptcy Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible, including, without limitation, that necessary (a) to ensure that the purposes and intent of the Plan are carried out, (b) to enforce and interpret the terms and conditions of the Plan, and (c) to enter such orders or judgments including, without limitation, injunctions necessary to enforce the rights, title, and powers of the Debtor and/or the Reorganized Debtor.  Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtor and to adjudicate and enforce all other causes of action that may exist on behalf of the Debtor.

### 11.2    Specific Purposes

Without limiting the effect of Section 9.01, the Bankruptcy Court shall retain jurisdiction after Confirmation to:

(a)    modify the Plan after entry of the Confirmation Order, pursuant to the provisions of the Plan, the Bankruptcy Code, and the Bankruptcy Rules;

(b)     correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(c)     hear and determine any cause of action, and to enter and implement such orders as may be necessary or appropriate, to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

(d)     hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan, and to enforce, including by specific performance, the provisions of the Plan;

(e)     hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the settlement agreements or other agreements entered into by the Debtor during the Case;

(f)     enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, transfers of property or property rights, or other obligations contained in the Plan and the Confirmation Order;

(g)     assure the performance by Reorganized Debtor of their obligations to make distributions under the Plan;

(h)     enter such orders or judgments, including injunctions, as necessary to enforce the title, rights, and powers of the Debtor, Reorganized Debtor, or the Plan;

(i)     hear and determine any and all adversary proceedings, applications, and contested matters, including any remands after appeal;

(j)     ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(k)     hear and determine any timely objections to or motions or applications concerning Claims or the allowance, classification, priority, compromise, setoff, estimation, or payment of any Claim, to the fullest extent permitted by the provisions of Section 157 of title 28 of the United States Code;

(l)     enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(m)     hear and determine any motions, contested matters or adversary proceedings involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtor and/or Reorganized Debtor arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Case;

(n)     hear and determine all applications for the employment or compensation of Professionals and reimbursement of expenses under Sections 330, 331, or 503(b) of the Bankruptcy Code or the Plan;

(o)     recover all assets of the Debtor and property of the Estate wherever located, including actions under chapter 5 of the Bankruptcy Code;

(p)     hear and determine any and all motions pending as of the Confirmation Date for the rejection, assumption, or assignment of Executory Contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(q)     hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(r)     consider and act on the compromise and settlement of any Claim against, or Equity Interest in, the Debtor, including, without limitation, any disputes relating to any Administrative Claims or any Bar Date;

(s)     hear and determine all questions and disputes regarding title to the assets of the Debtor or its Estate;

(t)     To issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code; and the court may issue such orders in aid of consummation of the Plan under Sections 105 and 1142 of the Bankruptcy Code, including orders to authorize the Debtor (or such other party as may be designated by the Bankruptcy Court) to deliver and execute, on behalf of the Lender, any documents evidencing the Restructured A&D Loan or related agreements;

(u)     hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Case;  and

(v)     enter such orders as are necessary to implement and enforce any injunctions provided for in the Plan and Confirmation Order.

**ARTICLE XII.**
**MISCELLANEOUS**

**12.1    <u>Amendment or Modification of the Plan</u>**

The Plan may be amended or modified by the Debtor prior to the hearing on confirmation without notice or hearing and without an additional Disclosure Statement pursuant to § 1127(a) of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 3019. Post-confirmation amendments or modifications of the Plan may be allowed by the Court under § 1127(b) of the Bankruptcy Code if the proposed amendment or modification is offered before the Plan has been substantially consummated. The sole right to amend or modify the Plan at any time shall be reserved to the Debtor.

**12.2**     <u>**Effective Date and Final Decree**</u>

       The effective date will be the first Business Day that is ten (10) days after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; and (b) all conditions to effectiveness set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. No payments to Creditors will be made prior to the Effective Date. Debtor intends to file a motion for entry of a final decree within six (6) months from the Effective Date.

**ARTICLE XIII.**
**REQUEST FOR APPROVAL AND ACCEPTANCE OF PLAN**

       WHEREFORE, DEBTOR RANCH 967 LLC submits this Disclosure Statement and the information contained therein, in good faith, in accordance with the provisions of Title 11, U.S.C. § 101 et. seq. for consideration by Creditors and other parties in interest, and as the sole source of information furnished by the Debtor, or to be furnished by the Debtor, in solicitation of acceptance of Debtor's Plan.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Dated this 15th day of September, 2015.

RANCH 967 LLC

*/s/ Frank Carmel*
By:  Frank Carmel
Its:   Managing Member

TAUBE SUMMERS HARRISON
TAYLOR MEINZER BROWN LLP
Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
Christopher G. Bradley
State Bar No. 24069407
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

ATTORNEYS FOR DEBTOR

SIGNATURE PAGE – DISCLOSURE STATEMENT